*774 OPINION.
Matthews:
Petitioner, a corporation, seeks the deduction in 1931 of $69,209.59, representing the total sum of reductions by petitioner of its employees’ indebtedness to it and actual cash payments by petitioner to its employees, both reductions and payments being intended to relieve hardship on its employees resulting from their purchase of its own stock. This is the sole issue. The deduction is claimed as an expense under section 23 (a), Revenue Act of 1928, or, failing that, as a loss under section 23 (f). Petitioner did not take this deduction in its income tax return, but now seeks on account thereof a refund for taxes erroneously paid in the amount of $8,069.95, and a denial of the deficiency determined by the respondent in the amount of $235.20.
Briefly summarized, the facts are that the president and other officers of petitioner devised a scheme in November 1928 by which it would secure the faithful cooperation of its “ key ” employees in its dairy business by financing the purchase by them of stock in the corporation. It was arranged, therefore, that petitioner’s president and another should act as trustees to hold the stock purchased by the employees until it should be fully paid for. It was then to be delivered to the purchasers. In the meantime, however, they were to reduce the principal obligation by as much as $10 a share a year and pay interest on the balance, but were to have credited to them any dividends declared. The money for the purchase was advanced by the corporation, the total being $132,706.59. Eighteen employees responded and bought stock through the corporation on credit.Three others bought in the open market at the suggestion of the president of petitioner. The trustees held the stock until February 4, 1931, when it was exchanged, pursuant to authorization by the directors and the employee-purchasers, for the stock of the National Dairy Products Corporation, share for share. Those employee-stockholders who by then had paid up for their stock and also those who had bought originally in the market came in under the same plan and made an exchange. The exchange was part of a plan by which the National Dairy Products Corporation was to absorb petitioner. Petitioner had in 1930 and 1931 about 75,000 shares of common stock outstanding while the National Dairy Products Corporation then had some 6,000,000 shares. On May 1, 1931, the directors of petitioner decided to make the reductions and cash payments in question, and did so on the basis of a cost of $48 a share. The then market value of the National Dairy Products Corporation stock was $43 a share. The reason for this adjustment, as Thomas, the petitioner’s assistant treasurer testified, was to relieve the hardship of the employee-stockholders who had been induced by the corpora *775 tion to buy its stock, and thus to remove the general soreness and dissatisfaction toward petitioner which the fulfillment of their contracts of purchase with petitioner was causing. In other words, the interest of petitioner’s principal employees in the corporation which would nominally have resulted from stock ownership, had now, owing to the fall in market value of the stock, become a burden and, their purchases having been induced by the corporation, this burden a source of estrangement between the corporation and its employees.
It is not suggested that the credits and payments were in the nature of additional salary, and there is no indication in the record that the number of shares bought by a particular employee had any relation to his salary as such, except, naturally, that those with larger salaries had more money to invest and for the most part bought more stock than the lesser employees.
, Were these credits and cash payments either deductible expenses or losses? Petitioner made the credits and payments voluntarily and was under no legal obligation to do so. A gift made voluntarily is not in the category of losses, and we must conclude that they were not losses. It remains to examine the question whether such payments made on grounds of business expediency, to secure the good will of its employees, can be called “ ordinary and necessary expenses ” within the meaning of the statute. We do not question the avowed purpose for which the payments were made nor attempt to set aside petitioner’s judgment that it would in the long run be advantageous to it thus to remove the cause of disaffection of its principal employees. We are concerned only with the statutory definition which limits the deduction.
While it is clear that “ ordinary ” as used in the statute is not confined to what would be habitual in the experience of the particular taxpayer, it must be what is normal in the life of the group to which the taxpayer belongs, in the life of the community. Such an ordinary expense, for instance, would be counsel’s fees incurred in a lawsuit affecting the safety of the business. It is the expected method of defending the taxpayer from attack. This was made clear by the Supreme Court in Welch v. Helvering, 290 U. S. 111. The facts of that case set forth a situation closely paralleled by the situation here. There, the secretary of a corporation which had been adjudged an involuntary bankrupt and had had a discharge from its debts, in order to solidify his personal credit with former customers of the corporation, decided to pay the corporation’s debts so far as he was able, and accordingly made substantial payments over a period of years, which he sought to deduct as ordinary and necessary expenses. The Court pointed out that such conduct conformed to no known business practice, to no settled norm, for men do not ordi *776 narily pay debts of others without legal obligation to do so. “ Indeed ”, said Cardozo, J., speaking for the Court, “ if language is to be read'in its natural and common meaning * * * we should have to say that payment in such circumstances, instead of being ordinary is in a high degree extraordinary.” It was assumed by the Court that the expenses were “ necessary for the development of the petitioner’s business, at least in the sense that they were appropriate and helpful.” “ But ”, the Court continued, “ the problem is not solved when the payments are characterized as necessary. Many necessary payments are charges upon capital. There is need to determine whether they are both necessary and ordinary.” In the instant ease, therefore, even if we assume that the credits and cash payments by petitioner to its employee-stockholders were wholly desirable to promote its own interests, we can not say that the voluntary surrender of $69,000, without any legal compulsion, was an “ ordinary ” expense. On the contrary, we are of the opinion that it was quite extraordinary.
The cases upon which petitioner relies are clearly distinguishable. We may lay on one side the line of cases where the corporation has made contributions to charitable or educational institutions of the town where its works are situated in the expectation that it will reap a direct business advantage from the improved health or condition of its employees. American Rolling Mill Co. v. Commissioner, 41 Fed. (2d) 314 (C. C. A., 6th Cir.); Popular Dry Goods Co., 6 B. T. A. 78; Poinsett Mills, 1 B. T. A. 6; Holt-Granite Mill Co., 1 B. T. A. 1246; H. H. Bowman, 16 B. T. A. 1157; Corning Glass Works v. Lucas, 37 Fed. (2d) 298 (App. D. C.). On one side also we must leave those cases allowing the deduction of contributions made to combat dangers to the business itself. Alexander Sprunt & Son, Inc., 24 B. T. A. 599; George M. Cohan, 11 B. T. A. 743. Gifts made to a few individual employees are not expenditures for the benefit of all.
More nearly akin to the situation here was that prevailing in Blackwell Oil Gas Co. v. Commissioner, 60 Fed. (2d) 257 (C. C. A., 10th Cir.), where the corporation was denied the deduction of gratuitous payments to stockholders in settlement of disputes between them. Harris & Co. v. Lucas, 48 Fed. (2d) 187 (C. C. A., 5th Cir.), cited by petitioner, is similar, but distinguishable both on its facts and its ratio decidendi. There a department store compromised with its creditors by paying 50 cents on the dollar. It lost its credit thereby, and found, after several years’ experience, that it could not profitably carry on its business on a cash basis. As it deemed absolutely necessary a return to its old credit basis and believed it could not effect it' otherwise than by voluntarily assuming and paying the unpaid remainder of its extinguished obligation, it did so; and this amount was allowed as a *777 deduction by the Circuit Court, reversing this Board, 16 B. T. A. 705. The court states in its opinion, one of the three judges dissenting, that the words “ ordinary ” and “ necessary ” in the statute were not to be read conjunctively, a view which the Supreme Court has since, as we have seen, repudiated in Welch's case. The facts are also distinguishable. The corporation in that case knew by trial and error that the payments were at least necessary, for it had tried for several years to do business on the new basis before yielding to the alternative; here, the asserted necessity is only a matter of opinion 'held by petitioner’s officers. Again, the corporation there was paying obligations for which it felt itself morally liable (if moral compulsion may be said to act on corporations) and for which it had once been legally liable. Here, the petitioner bestowed a simple gratuity, paid something for which it had never been legally liable, and for which, so far as the record reveals (and unless strong pressure had been brought on unwilling employees to make them buy its stock, which is not suggested), the petitioner was not morally liable. A falling market was common to practically all corporation stocks in the years in question, but it can not therefore be called usual conduct for a corporation voluntarily and of grace to relieve the resulting hardships on its stockholders.
We hold that the deduction should not be allowed.

Judgment will be entered for the respondent.